**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| LAUREN SMITH | : | CIVIL ACTION |
| | : | |
| v. | : | NO.   15-6542 |
| | : | |
| SCOT ENGLER, ET AL. | : | |

**MEMORANDUM**

SCHMEHL, J.  /s/ JLS                                                    **JUNE 14, 2018**

Plaintiff brought this 42 U.S.C. § 1983 action, claiming that her termination as a kindergarten teacher with the Palmerton Area School District ("PASD") by defendant Superintendent Scot Engler ("Engler") was in retaliation for Plaintiff exercising her First Amendment right to express concern about the lack of fulfillment of individualized education plans within the PASD and the conduct of another teacher, defendant Shanna Matthews Koscinski ("Koscinski"). Plaintiff also alleges that by terminating her, Engler deprived her of a liberty interest by impugning her honesty and morality, thereby entitling her to a name-clearing hearing. Finally, Plaintiff also alleges that by terminating her without just cause, Engler deprived Plaintiff of a property interest. Plaintiff has also added state law claims against all the defendants for tortious interference with a contract (Count II), tortious interference with a prospective economic advantage (Count III), libel/defamation (Count IV), false light/invasion of privacy (Count V) and civil conspiracy (Count VI). Plaintiff subsequently voluntarily withdrew Count V. [ECF 6.] Presently before the Court is the defendants' motion for summary judgment. For the reasons that follow, the motion will be granted.

Following completion of discovery and shortly before dispositive motions were due, Plaintiff's counsel filed a motion to withdraw along with a declaration and exhibits. [ECF 19.] Counsel requested that these documents be filed under seal, which the Court granted. [ECF 25.] Following a hearing, the Court granted Plaintiff's counsel's motion to withdraw and stayed the action for a period of 60 days so that Plaintiff could secure new counsel. [ECF 28.] When Plaintiff informed the Court that she was unable to secure counsel after the 60-day period expired, the Court granted Plaintiff's request for an additional period of 30 days to secure counsel. [ECF 34.] In doing so, the Court cautioned Plaintiff that if at the end of the 30 day period, she still had not secured counsel, the case would proceed with Plaintiff appearing pro se and needing to file a response to the Defendants' motion for summary judgment. [ECF 34.] Plaintiff failed to secure counsel and failed to file a response to the motion for summary judgment.

When a party fails to respond to a properly filed motion, the Court may treat the motion as uncontested. E.D. Pa. Local R. Civ. P. 7.1(c). In the case of a motion for summary judgment, however, the Court "may not grant an uncontested summary judgment motion without an independent determination that the movant is entitled to judgment under Fed. R. Civ. P. 56." *B&B Fin. Servs. LLC v. Kallock*, No. CIV. A. No. 05-1277, 2006 WL 2869529, at *1 (E.D. Pa. Oct. 4, 2006); *see Hitchens v. County of Montgomery*, 98 Fed. App'x 106, 110 (3d Cir. 2004) (providing the same). Still, "[b]y failing to respond . . . 'the nonmoving party waives the right to respond to or to controvert the facts asserted in the summary judgment motion.'" *Kallock*, 2006 WL 2869529, at *1 (citing *Reynolds v. Rick's Mushroom Serv.*, 246 F. Supp. 2d 449, 453 (E.D. Pa. 2003)). Thus, when a party fails to respond, the court may consider the facts

stated in the motion for summary judgment "undisputed for the purposes of the motion." *Goodwin v. Kope*, CIV. A. No. 13-1290, 2016 WL 3087389, at *2 (E.D. Pa. June 2, 2016).

**STANDARD OF REVIEW**

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009)(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986)). A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

In undertaking this analysis, the court views the facts in the light most favorable to the non-moving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." Pignataro v. Port Auth. of N.Y. and N.J., 593 F.3d 265, 268 (3d Cir. 2010) (citing Reliance Ins. Co. v. Moessner, 121 F.3d 895, 900 (3d Cir. 1997)). While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the non-moving party who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250.

**STATEMENT OF UNDISPUTED FACTS**

Since Plaintiff has failed to respond to Defendants' motion for summary judgment, the Court will consider the facts stated in the motion as unopposed. Out of an abundance of caution, the Court nevertheless verified each of the Defendants' factual suppositions. The following comprise the Court's statement of undisputed facts ("SUF"):

1. Plaintiff, Lauren Smith is 28 years old and resides with her parents. (Deposition of Lauren Smith, ECF 33-1, at p. 12.)

2. Prior to becoming employed as a kindergarten teacher for PASD, Plaintiff obtained an associate's degree at Lehigh Carbon Community College, and a bachelor's degree from East Stroudsburg with a dual certification in elementary education and special education. (*Id.* at p. 14.)

3. Plaintiff has never worked as a special education teacher. (*Id.* at p. 15.)

4. Plaintiff was employed by the PASD as a kindergarten teacher after having worked for the District as a student teacher. (*Id.* at pp. 12-13; 15-16.)

5. Plaintiff's mother, Lori Smith, who had been employed at the PASD for many years, taught children with learning disabilities. (Compl., at ¶ 12; ECF 8, at ¶ 12.)

6. Defendant, Scot Engler (Engler) was (and is) the Superintendent of PASD, Defendant, Shanna Mathews Koscinski (Koscinski) was (and is) employed as a teacher in the PASD, and Defendant, Lisa Ward (Ward) was (and is) a teacher at the Towamensing Elementary School ("Towamensing") and a union representative for the teachers at the school. (Compl., at ¶¶ 1-4; ECF 8, at ¶¶ 1-4; Deposition of Thomas Smelas, ECF 33-2 at pp. 9-10; Deposition of Lisa Ward, ECF 33-3, at pp. 7-8.)

7. Koscinski had been a special education teacher in the PASD who was assigned to assist students with IEPs inside of regular classrooms taught by other teachers. (Compl., at ¶ 14; ECF 8, at ¶ 14; Deposition of Shanna Koscinski, ECF 33-4, at pp. 8-10.)

8. The PASD is in compliance with teacher-student ratio for special education caseloads. (Deposition of Scot Engler, ECF 33-5, at pp. 13-14.)

9. Engler testified that he has met with parents about their complaints concerning their special education students and resolved their concerns. (*Id.*, at pp. 19-20.)

10. Engler testified that he has met with teachers about parents' complaints regarding their students. (*Id.*, at pp. 21-22.)

11. Plaintiff often drew caricature illustrations while teaching kindergarten classes. (Deposition of Lauren Smith, at p. 34.)

12. Towamensing is a public school. (*Id.*, at p. 40.)

13. Plaintiff was a public school teacher at Towamensing. (*Id.)*

14. Plaintiff frequently interacted with parents of students while working at Towamensing. (*Id.*, at p. 45.)

15. As a kindergarten teacher, Plaintiff's responsibilities included classroom instruction, testing, observation and data collection. (*Id.*, at pp. 47-48.)

16. Plaintiff also worked with students with IEPs. (*Id.*, at p. 48; Compl., at ¶ 13.)

17. On June 25, 2013, Plaintiff signed a three-year Temporary Professional Employee's Contract that constituted an agreement between Plaintiff and the Board of School Directors of the PASD. (Deposition of Lauren Smith, at pp. 320-323; Temporary Professional Employee's Contract, ECF 33-6.)

18. The contract noted that it was subject to the provisions of the Public School code of 1949 and amendments thereto, regarding all qualifications and certification as required therein, and that the term "Temporary Professional Employee" as used therein meant the same thing as the term was defined in the School Code, as amended. (*Id.*)

19. The contract provided that "if said Temporary Professional Employee shall have served the Palmerton Area School district for a period for [sic] three years and shall have received a satisfactory rating during the last four months of the third year from the properly authorized Superintendent of Schools, the above employee thereafter shall be considered a professional employee and shall be tendered forthwith a professional employee's contract as provided in the School Code." (*Id.*)

20. The contract further stated that: "the said temporary employee shall for all purposes, except tenure status, be viewed in law as a full-time employee and shall enjoy all the rights and privileges of regular full-time employees." (*Id.).*

21. According to the contract, the Temporary Professional Employee could terminate the contract by written resignation presented sixty (60) days before the resignation becomes effective, or by the school board in accord with the provisions of Sections 1108, 1122 and 1123 of the School Code for the dismissal of unsatisfactory temporary professional employees. (*Id.*)

22. On December 22, 2014, during a school Christmas party, Plaintiff gave her assistant teacher, Kelly Heimrich ("Heimrich"), a gift consisting of a book of drawings that she had prepared. (Compl., at ¶ 18.)

23. Engler testified that Plaintiff claimed that the book contained drawings, allegedly intended to be humorous, about "people" Plaintiff and Heimrich knew and classroom situations they had experienced. (*Id.*;Deposition of Scot Engler, at pp. 44-45.)

24. There is no dispute that there was a book that had been prepared by Plaintiff and that there were images in the book. (*Id.*, at p. 71.)

25. There is no dispute that a certain number of students were depicted in the book. (*Id.*, at p. 71.)

26. Plaintiff contends that there were six drawings/caricatures in the book, including one of a mutual friend of Plaintiff and Heimrich, and of students in Plaintiff's classroom. (Compl., at ¶ 18.)

27. Later in the day on December 22, 2014, while Heimrich was showing the book to another teacher, Eileen Long, (Long), Koscinski "observed" the contents of the book. (*Id.*, at ¶ 19; Deposition of Shanna Koscinski, at pp. 49-50; Deposition of Lauren Smith, at pp. 122-123.)

28. Koscinski testified that the book was a three-ring binder with a flimsy plastic red cover. Underneath the red cover, there was a page that had a large heart on it that said, "[E]verything I need to know in life I learned in kindergarten." Around the heart were illustrations of syringes, needles, alcohol bottles, and sex toys. On the next page was a warning that said, "This is a breach of confidentiality." The following page was a letter to Heimrich that essentially said thank you for being in my classroom and keeping me sane. Towards the end, it mentioned being in Christine's office or dungeon panic room. It also mentioned Plaintiff  "licking Uncle Darrell's asshole." (Deposition of Shanna Koscinski, at pp. 75- 76.)

29. "Uncle Darrell" was a friend of Christine Steigerwalt ("Steigerwalt"), the Principal of Towamensing. Deposition of Christine Steigerwalt, ECF 33-7, at p. 12, who had been to Towamensing several times to help out as a volunteer. (Deposition of Kelly Heimrich, ECF 33-8, at pp. 63-64.)

30. Koscinski testified that, on the following pages, in no particular order, there were drawings of Mrs. G, which Koscinski believed referred to Mrs. Gebhardt from the cafeteria since the drawing was of a heavyset woman wearing a sweatband around her head, a student named "M.B." drooling with food all over his clothing and a speech bubble that said "asshole, mumble, mumble bitch." His name was on the paper. There was also an illustration of a student named "J." He is a mixed race student and also overweight, who was drawn to look like Fat Albert with a pudding container in the background. His name was written as well. (Deposition of Shanna Koscinski, at pp. 76-77; Deposition of Lauren Smith, at pp. 113-116.)

31. According to Koscinski, there was a picture of a student named "K", depicted as very dirty, with wild hair with little bugs like lice crawling in her hair. K was depicted wearing a backpack containing items that Plaintiff wrote were items that K. had stolen from school. There was also a picture of a student named "D"., drawn with a speech bubble that said "I'm gifted," while he was holding a sensory wedge seat and instead of his name, "asshole" was written at the bottom of the picture. (Deposition of Shanna Koscinski, at p. 77.)

32. Finally, Koscinski testified that there was a picture of "A", "a little boy sitting on a toilet seat holding a piece of poop in his hands with a speech bubble that said 'it

was just so long.'" There was a picture of C., who has difficulty communicating. He was drawn to be sitting in a pile of urine and feces with flies flying around him. (*Id.*, at p. 77.)

33. Plaintiff alleges that, "[u]pon information and belief, [Koscinski] . . . went to defendant Lisa Ward and/or to other local union officials and complained that the book of drawings made fun of students and teachers in a demeaning, derogatory way." (Compl. at ¶ 20.)

34. Koscinski sought out Ward, the building representative, and told Ward what she had seen. Later, Ward came into Koscinski's classroom with Jody Kocher ("Kocher") – Ward's mentor. They recommended calling Thomas Smelas ("Smelas") , the union president. (Deposition of Shanna Koscinski, at p. 52; Deposition of Lisa Ward, at pp. 18-20.)

35. Kocher suggested that Koscinski speak with Meghan Garrett ("Garrett"), the PASD psychologist , which Koscinski did. (Deposition of Shanna Koscinski, at p. 54.)

36. Plaintiff learned that the book became a problem later that day (December 22, 2014) when taking her students out of the cafeteria. (Deposition of Lauren Smith, at pp. 132-133.)

37. At the same time, Lauren's  mother, Lori Smith, was taking her class out of their room, and said to Lauren, "[t]hey're up there talking about you and this book." (*Id.*, at p. 136.)

38. At that time, Ward, at the suggestion of Smelas, approached Plaintiff and Heimrich  and requested the book of drawings. (Compl., at ¶ 21. See also, Deposition of Lauren Smith, at p. 136; Deposition of Lisa Ward, at pp. 22-24.)

39. Heimrich went to her classroom to retrieve the book, but Plaintiff's mother, Lori Smith, told Heimrich that she did not want her to give the book to Ward. (Compl., at ¶ 21; Deposition of Lauren Smith, at pp. 137-138, 142-144; Deposition of Thomas Smelas, at p. 37; Deposition of Lisa Ward, at pp. 24-30.)

40. Ward testified that even though she indicated to Plaintiff that she was only trying to help her and that Plaintiff should give her the book, Plaintiff, with the book in her left hand, looked to her mother, raised her right hand and said "I don't want to get fired. I don't know what to do. I don't want to get fired." (*Id.*, at pp. 29-30.)

41. Ward testified that Lori Smith got "pissed off," grabbed the book out of Plaintiff's hands, walked to her car, put the book in her car, walked back, looked at Ward and said, "now it's on private property." (*Id.*, at p. 30. Deposition of Lori Smith, Exhibit "I," at p. 84.)

42. As a result, Ward informed Lori Smith that she was going to let Smelas know that Mrs. Smith refused to turn over the book. (Compl., at ¶ 21; Deposition of Lauren Smith, at p. 142.)

43. Ward then advised Plaintiff that Smelas wanted to meet with her later in the afternoon on December 22, 2014. The meeting took place in the guidance counselor's office of Towamensing with Ward present. (Compl., at ¶ 22; Deposition of Lauren Smith, at p. 147.)

44. According to Plaintiff, Smelas told Plaintiff that her drawings could be misinterpreted, advised her to destroy the book of drawings and not to say anything about the book, and allegedly informed her that "everything" would be handled "in-house." (Compl., at ¶ 22; Deposition of Lauren Smith, at pp. 155-156.)

45. According to Plaintiff, she went home and informed her mother what Smelas had said. Plaintiff's mother told Plaintiff to follow Smelas' instructions. (Compl., at ¶ 23.)

46. Plaintiff went home later that day to find her father outside burning their old couches. (Deposition of Lauren Smith, at 159-161; Deposition of Lori Smith, at pp. 106-109.)

47. Plaintiff told her father about the book and the circumstances surrounding it. (Deposition of Lauren Smith, at pp. 161-162.)

48. Plaintiff retrieved the book from her mother's car and handed it to her father. Plaintiff's father flipped through it and tossed it into the fire. (*Id.*, at pp. 161-163; Deposition of Lori Smith, at pp. 106-109.)

49. The next day, which Plaintiff states that she had previously scheduled as a day off for medical reasons, Plaintiff received a telephone call at home from Steigerwalt, who informed Plaintiff that she was aware of the book of drawings and wanted Plaintiff to produce it. Compl., at ¶ 24; Deposition of Lauren Smith, at p. 163.)

50. Plaintiff testified that she told Steigerwalt that she could not produce the book because she had destroyed it at the instruction of Smelas. (Compl., at ¶ 24; Deposition of Lauren Smith, at p. 164.)

51. Garrett informed Steigerwalt about Plaintiff's book after speaking with Koscinski. (Deposition of Meghan Garrett, ECF 33-10 at p 29; Deposition of Lisa Ward, at pp. 48-49, 70; Deposition of Christine Steigerwalt, at pp. 28-29.)

52. Engler testified that he first learned of the book on December 23, 2014, from Steigerwalt. (Deposition of Scot Engler, at p. 23; Deposition of Christine Steigerwalt, at p. 46.)

53. Engler testified that he recalled having a meeting with Koscinski, Ward, Smelas, and Steigerwalt relative to Koscinski's concerns about the book of drawings; after that, Koscinski, Ward, Smelas and Steigerwalt met with Plaintiff. (Deposition of Scot Engler, at p. 24.)

54. Engler testified that Koscinski had given him an account of what she saw in the book and that he became very concerned and upset because he knew some of the students mentioned in the book. (*Id.*, at p. 24.)

55. Engler testified that it was traumatic to hear that the most innocent kids in the PASD would be portrayed in such a way. (*Id.*)

56. Specifically, Engler knew "K" and her family environment and he couldn't fathom that somebody would portray them in a demeaning or degrading way for a situation over which a 5 year old has no control. (*Id.*, at p. 24-25.)

57. Engler was also aware of "D" because of evaluation processes that had occurred, and it troubled him that "D" would be mockingly labeled as gifted when, to Engler's knowledge, "D" did not qualify as gifted. (*Id.*, at p. 25.)

58. Engler testified that he was likewise disturbed to hear of a drawing of a child standing in urine and feces simply because that child was not yet potty-trained. (*Id.*)

59. Engler testified that he heard of the description of the principal's office, which he thought was appalling. (*Id.*)

60. Engler testified that he did not, and could not, find any way that the book could be understood as "in jest," "or that there was any humor to it." (*Id.*)

61. Engler testified that he accepted Koscinski's account of the contents of the book, as, at that time, it was all the information he had. (*Id.)*

62. Plaintiff was instructed to appear for a meeting at the PASD administration office with Smelas, Engler and Steigerwalt. (Compl., at ¶¶ 25-26.)

63. According to Plaintiff, at that December 23, 2014 meeting at the PASD administration office when Engler asked where the book of drawings was located, Plaintiff told him that it had been destroyed at Smelas' direction. (Compl., at ¶ 26.)

64. In the presence of Plaintiff at that meeting, Smelas denied that he had so instructed Plaintiff, instead indicating that he had merely told her to "see that the book had been removed from the school premises." Plaintiff did not react to Smelas' denial. (Compl., at ¶ 26; Deposition of Scot Engler, at pp. 28, 81, 88, 92; Deposition of Thomas Smelas, at pp. 22, 25, 53; Deposition of Lisa Ward, at pp. 45-46.)

65. Plaintiff told Engler that she felt compelled to destroy the book even though she claimed she had nothing to hide because she was "nervous" and "listened to her mentors." (Deposition of Scot Engler, at p. 41.)

66. Engler testified that even if Smelas had told Plaintiff to destroy the book, Engler would still have recommended Plaintiff's termination and perhaps also sought discipline for Smelas. (*Id.*, at pp. 126-127.)

67. Engler testified that Plaintiff denied that there was a drawing of the principal's office within the book. (*Id.,* at p. 118.)

68. Plaintiff admitted to Engler that she had drawn "C", the selective mute boy who was drawn to be sitting in a pile of urine and feces with flies flying around him. (Deposition of  Lauren Smith at pp. 247-250. Deposition of Shanna Koscinski, at p. 77.)

69. Plaintiff admitted during her deposition that there were also pictures/caricatures of: Ms. Trisha Green saying, "I love Target"; "J", the learning

disabled boy with the pudding container in the background; the girl with the S.O.A.R. ticket; "D", the boy with the sensory wedge seat saying "I'm gifted"; the student who said his "poop" was "so long"; and, "K", the girl with wild hair/bugs and dirty clothes, who was portrayed as having taken items from class. (Deposition of Lauren Smith, at pp. 215, 242, 246-247, 251-256.)

70. Engler learned that Plaintiff had told her mother, Lori Smith, that if she placed the book in her mother's car, Plaintiff would be fired, which suggested to him that the book did not contain six pages of "innocuous" classroom humor, but, instead, that both Plaintiff and Lori Smith were aware of the contents of that book and felt that it needed to get off of school property. (Deposition of Scot Engler, at p. 90.)

71. Engler testified that he considered the destruction of the book as circumstantial evidence of the nature of the drawings that had been contained in the book. (*Id.*, at pp. 81-82.)

72. Engler testified that he did not recall if Steigerwalt had informed him prior to the "book incident" that Plaintiff had complained that Koscinski was not in Plaintiff's classroom when she was supposed to be, but, in any event, he was unaware of any such allegations prior to Plaintiff's termination. (*Id.*, at p. 57.)

73. Engler testified that Plaintiff's IEP concerns were not a catalyst for conducting the investigation into Plaintiff's book. (*Id.*, at pp. 57-58.)

74. Engler testified that he was unaware of any alleged criticism of the school district or of Koscinski by the Smiths prior to the time he recommended Plaintiff's termination. (*Id.*, at p. 124.)

75. Smelas testified that he never heard of any problems with IEPs or complaints regarding IEPs in the school district and that he would have been aware of any such problems involving Koscinski. (Deposition of Thomas Smelas, at pp. 17, 21, 39-40, 51-52.)

76. Ward testified that she never heard anyone complain that students at Towamensing with IEPs were not receiving proper assistance in the classroom, or of any disputes as to whether or not a student should have an IEP, or of any complaints from parents that their child had not been given an IEP when appropriate. (Deposition of Lisa Ward, at pp. 15-16.)

77. Garrett testified that she never heard anyone complain that students were not getting IEPs, never heard either Plaintiff or Lori Smith complain that students with IEPs were not getting services they were entitled to, and did not remember any complaints made by Plaintiff against Koscinski. (Deposition of Meghan Garrett, at pp. 12-14, 17.)

78. Steigerwalt testified that she only became aware of a complaint with IEPs after the "book incident" with Plaintiff. (Deposition of Christine Steigerwalt, at p. 72-73.)

79. Steigerwalt testified that she never heard complaints that students at Towamensing who should have IEPs were not getting them. (*Id.*, at p. 141.)

80. Steigerwalt testified that Plaintiff complained to her on one or two occasions that Koscinski was not in Plaintiff's classroom when she was supposed to be. As a result, Steigerwalt discussed the matter with Koscinski in November/December 2014. (*Id.*, at pp. 68-69.)

81. Steigerwalt testified that Koscinski never expressed any displeasure to Steigerwalt about Plaintiff bringing the matter to Steigerwalt's attention. (*Id.*, at p. 79.)

82. Steigerwalt testified that she does not believe that Koscinski's allegations related to Plaintiff's book were in retaliation for Plaintiff's complaint against her because other staff mentioned the caricatures and because, if Koscinski had had a concern, she would have come to Steigerwalt. (*Id.*, at p. 105.)

83. Steigerwalt testified that Plaintiff admitted to her that the caricature of the student in "pee and poop," was derogatory. (*Id.*, at pp. 156-157.)

84. Koscinski testified that, prior to December 22, 2014, she ad never heard that Lori Smith had made any complaints that students with IEPs at Towamensing were not receiving proper classroom assistance called for by their IEPs. (Deposition of Shanna Koscinski, at p. 30.)

85. Koscinski testified that Sometime in January of 2015, an email was sent to Steigerwalt concerning the lack of proper implementation of IEPs for two students at Towamensing. (*Id.*, at p. 30.)

86. Koscinski testified that a parent of one of the two children had complained that Lori Smith had shown a movie watched in the classroom. (*Id.*, at p. 32.)

87. Koscinski testified that the movie was actually an incentive for good behavior and the parent just wanted to know if the students watched a movie.(*Id.*, at p. 33.)

88. Koscinski acknowledged that, on one occasion, she received an email from Garrett with a copy to Plaintiff regarding M.B.'s placement in life skills versus learning support. (*Id.*, at p. 41.)

89. Plaintiff responded by saying M.B. received limited support and that it would be unfair to change M.B.'s placement. (*Id.*, at p. 44.)

90. Koscinski testified that M.B. received the support written into his IEP. (Deposition of Shanna Koscinski, at p. 44.) Plaintiff never spoke about the email with Koscinski. (*Id.*, at pp. 46-47.)

91. Garrett remembered the situation as a mere conversation between teachers regarding whether the student was making enough progress or whether a different process should be pursued. (Deposition of Meghan Garrett, at pp. 17-19.)

92. Engler took notes during the investigation of the "book incident" and his notes from his interview of Koscinski stated: " identifiable by picture only; M . . ., Eileen Long 'should have added snot'; J . . . , Fat Albert; C . . . , covered in urine and feces; D . . . , gifted, speech bubble I am gifted; in quotes, 'asshole,' at bottom; BM, a picture, so [long] (sic); K . . . , backpacks, stuff she's stolen; final picture, illustration of Chris Steigerwalt, purple vibrator, puddle; Comments, 38/DDs [Asked what 38DDs meant, Plaintiff had been overheard telling a kindergarten student to step back, she couldn't see over her 38DDs]." (Deposition of Scot Engler, at pp. 33-36.)

93. Engler noted that Plaintiff said no students were in the classroom when the book was being shown. (*Id.*, at p. 41.)

94. Although Plaintiff denied to Engler that there had been a drawing of the principal's office, in her Complaint, at paragraph 30, she alleged that there had been such a drawing but that it had been mischaracterized. (*Id.*, at pp. 117-118.)

95. Engler's last page of notes said, "suspend with pay pending investigation; statements from Eileen Long and Kelly Heimrich." (Deposition of Scot Engler, at p. 36; Compl., at ¶¶ 27-28.)

96. Engler wanted statements from Long and Heimrich because Koscinski told him that they had also seen the book. (Deposition of Scot Engler, at p. 37.)

97. After the Christmas break, Engler and Steigerwalt interviewed Ward, Garrett, Heimrich, Long and Lori Smith. (Deposition of Christine Steigerwalt, at pp. 67, 89, 90-102.)

98. Engler informed all witnesses that untruthfulness with respect to the matters being investigated would be grounds for termination. (Deposition of Scot Engler, at pp. 47-49; Deposition of Kelly Heimrich, at pp. 96-97.)

99. Engler interviewed Long. (Deposition of Scot Engler, at p. 63.)

100. Long told Engler that she saw a red binder, drawn caricatures, and that students were in the room while the book was being shown, along with Koscinski, Heimrich, and Plaintiff. (*Id.*, at p. 63.)

101. Engler testified that Long told him she saw a picture of "C", might have been in a pile of "poop," because he "poops himself." (*Id.*, at p. 63.)

102. Engler also interviewed Heimrich during his investigation, who told him that she recalled seeing caricatures of: Mrs. Green with a scarf around her neck and a Dunkin Donuts cup; Heimrich standing in a furry vest; Plaintiff, hair pulled up messy, marker in hand; a little girl, with a SOAR ticket; J, a child on the floor crying; M., with food on his clothes; a child with disheveled hair;  C, standing in a pile of pee and poop; D, wearing an "I'm gifted" shirt; and K, with her pants pockets out and whatever she had stolen around her. (*Id.*, at p. 66.)

103. In her deposition, Heimrich admitted that the book contained caricatures of: the cafeteria worker; M.B., who was illustrated to be covered in food; C., standing in

urine and feces; D., with a shirt that read "gifted"; and, K., with her pants pockets turned out and surrounded by items she had stolen from class. (Deposition of Kelly Heimrich, at pp. 64-68, 70-71.)

104. Heimrich told Engler that she had taken Long over to a table to show her the book and that Koscinski had been on the other side of the table. (Deposition of Scot Engler, at p. 66.)

105. Engler testified that he found it odd that Heimrich had used the word "paraphernalia" in one of her descriptions and that Koscinski had described the cover of the book to be depicted with images of hypodermic needles, syringes and sexual content. (*Id.*, at p. 67.)

106. Engler found that the accounts by Long and Heimrich of Mrs. Green, the child with the SOAR ticket, Plaintiff, and the child on the floor crying had corresponded "very conveniently" with the account given to him by Plaintiff's statement. (*Id.*, at pp. 67-68.)

107. Heimrich had discussed Plaintiff's book with Plaintiff on two occasions between December 23, 2014, and January 2, 2015. (Deposition of Kelly Heimrich, at p. 100.)

108. Heimrich admitted that when she was interviewed by Engler and Steigerwalt, she was given the opportunity to explain Plaintiff's book and her understanding of its intent. (*Id.*, at p. 76.)

109. Engler's investigation was completed by January 6, 2015. (Compl., at ¶¶ 27-28.)

110. Engler offered to allow Plaintiff to resign so that she would not have a termination on her employment record. (Deposition of Scot Engler, at pp. 93-96.)

111. Engler testified that had Plaintiff been contrite and honest during the course of the interviews, Plaintiff would have been disciplined, but not terminated. Engler indicated that Plaintiff had been dishonest, manipulated the process/system, and destroyed evidence. (*Id.*, at pp. 75-76, 92, 116-117.)

112. Engler testified that he had found enough commonalties to show that Plaintiff had created a book degrading and humiliating to children, and he had an obligation to the kids and to the School District to protect them. (*Id.*, at pp. 79, 92.)

113. According to Heimrich, Engler stated that he based his decision to recommend that Plaintiff be dismissed on everyone's statements and not just Heimrich's. (Deposition of Kelly Heimrich, at p. 89.)

114. Steigerwalt believed Koscinski's allegations because of the descriptive nature of her allegations and because her statements were consistent. (Deposition of Christine Steigerwalt, at pp. 118- 119.)

115. Plaintiff testified that she chose to be fired rather than to resign, because Landis told her that she could file a grievance against the termination. (Deposition of Lauren Smith, at pp. 197, 324.)

116. Plaintiff was a temporary employee and not tenured at the time of her termination. (Deposition of Scot Engler, at pp. 88-89.)

117. Following his investigation, Engler  wrote a letter to Plaintiff dated Janury 15, 2105, informing her that he had recommended that the PASD Board of Directors dismiss her from employment as a professional employee of the District and notified her

that the Board would be conducting a hearing to determine whether she would be dismissed as a professional employee of the District. The letter further notified and advised Plaintiff of her right to a hearing either "in person or by counsel or both before the Board of Directors prior to the Board making its decision on your proposed dismissal." (See, January 15, 2015 Letter from Scot Engler to Lauren Smith, ECF 33-11.)

118. In the January 15, 2015 letter, Engler further stated that it was specifically charged, and that the Board would determine whether the following constituted grounds for dismissal:

"Drafting, bringing to school, and sharing with personnel while at school, a book that creates caricatures and makes fun of students taught by Smith, and other employees, including, but not limited to the following:

a) Cover page stating 'Everything I need to know in life I learned in Kindergarten.' Accompanied with illustrations of alcohol, syringes, and other drug paraphernalia and sexual content;

b.) The second page or back page: 'this is a breach of confidentiality. The next page addressed to Kelly Heimrich, an aide in the classroom, thanking her for understanding Smith and being in Smith's room and said that 'without you I would be in' Steigerwalt's (building principal) office/panic room/dungeon 'licking UD's (Uncle Darrell's) asshole.'

c.) Another page depicted an illustration of ' Mrs. G.' whom is believed to be cafeteria worker mocking her.

d.) Each of the following pages contained a caricature of different students from Smith's classroom with their names written at the bottom of the page under their drawing. The following are the ones that can be memorialized:

1) M.B. – covered in food and drooling with a speech bubble that said 'asshole, mumble, mumble, bitch.' This mocks the student's speech disability and occupational therapy needs.

2.) J.L. – made to look like 'Fat Albert' with a picture of a pudding container in the background. This mocks the student's weight and ethnicity. This caricature is of a student with a learning disability.

3) C. – covered and standing in a pile of urine and feces with flies all around him. This was admitted to by Smith.

4) D. – standing and holding a sensory wedge seat with a speech bubble saying 'I'm gifted. Look at my new sensory seat!' At the bottom of the page was the word 'asshole' instead of his name.

5.) A. – sitting on the toilet holding a large piece of poop. On the side of the page it said 'It was just so long.' This was in reference, admitted to by Smith, to a time when he was in the bathroom too long and when asked about it he said that.

6.) K.L. – filthy with wild hair (filled with lice) and dirt patches all over her clothing. Beside her was a backpack overflowing with things she had 'stolen' from the classroom or her peers again, as admitted to by Smith.

7.) The last student page was of a girl in the other kindergarten classroom who wears her hair in a tight bun on her head. It was labeled 'kiss ass' at the bottom instead of her name and she was shown with a speech bubble saying 'I want to be on blue!'

8.) The final page of the book was of Mrs. Steigerwalt, the principal. It was an illustration of her office or the room they believe she has 'dedicated to worshipping Miss Smith.' On the wall of the office was a frame with a 'lock of Lauren's hair', a drawing of Elephant and Piggie, a picture of a rooster/cock, and other frames related to their past experiences together. Her desk was drawn to be messy and in an L shape. Below her desk, on the floor, was a purple vibrator with a puddle around it. The illustration suggests that she used it to masturbate while looking and thinking about Lauren and/or her pictures.

Lying during the course of the investigation conducted by Superintendent Scot Engler regarding the contents and whereabouts of the book. Specifically, providing false information on the contents of the book on 2 separate occasions only to confess to number 3 above after specific questioning regarding this item. After confessing to creating the caricature identified in number 3, Ms. Smith abruptly stated 'we need to stop this meeting'

Destruction of evidence of wrongdoing with the intent to thwart an investigation. " (*Id.*)

119. The January 15, 2015 letter concluded: "[y]ou will remain on suspension without pay pending the official action taken by the board at their meeting date of February 17, 2015 . . . ." (*Id.*)

120. Plaintiff was terminated by vote of the PASD School Board on February 17, 2015, based upon Engler's recommendation. (Compl., at ¶ 32; February 23, 2015 Letter from Scot Engler to Lauren Smith, ECF 33-12.)

121. Koscinski now teaches Plaintiff's former classroom and teaches her former students. (Compl. at ¶ 33;Deposition of Scot Engler, at pp. 111-112.)

122. Heimrich testified that to her knowledge Koscinski had never said anything prior to December 22, 2014 about wanting to become a full-day kindergarten teacher. (Deposition of Kelly Heimrich, at pp. 87-88.)

123. Steigerwalt testified that Koscinski was offered the position because she was qualified and a good fit for the position. (Deposition of Christine Steigerwalt, at pp. 137-138.)

124. Engler was required to report the incident to the Pennsylvania Department of Education, as part of an educator misconduct complaint investigation. The Department of Education corroborated through their own investigation that a derogatory and detrimental book had been created.  (Deposition of Scot Engler, at pp. 120-121; February 22, 2017 Correspondence from Pennsylvania Department of Education, ECF 33-13.)

125. The Department of Education investigated the complaint. (Deposition of Kelly Heimrich, at pp. 76-78.)

126. After its investigation, the Department of Education concluded that Plaintiff had "in fact created and shared an unprofessional and offensive booklet that depicted staff and students in significantly degrading ways." (February 22, 2017 Correspondence from Pennsylvania Department of Education, ECF 33-13.)

127. The Department determined that "[a]fter careful review, the . . . termination from the Palmerton Area School District constitutes sufficient discipline regarding the allegations that are the subject of the educator misconduct complaint." (*Id.*)

128. Although the Department found that her termination from the PASD constituted sufficient punishment of Plaintiff, the Department issued her a "non-disciplinary warning letter stating that her actions may constitute a violation of the Educator Discipline Act and/or the Code of Professional Practice and Conduct for Educators." (*Id.*)

129. Periodic IEP trainings are offered in the PASD, and, in January 2015, the PASD offered individual sessions with an expert in order to talk with individual teachers about IEP concerns, IEP procedures, and their caseloads. (Deposition of Scot Engler, at pp. 112-114.)

130. On January 20, 2015, Steigerwalt sent a letter to Lori Smith regarding schedule changes and procedures to be followed with regard to students with IEPs in her class, and warning Lori Smith not to meet with Koscinski unless Steigerwalt was also present. (Compl., at ¶ 31; Deposition of Christine Steigerwalt, at pp. 134-136. 139.)

131. After her termination by the PASD, Plaintiff applied for a kindergarten teacher position with Allentown School District but was not hired because she was not forthcoming about her termination from Palmerton. (Deposition of Lauren Smith, at pp. 61-62.)

132. Plaintiff testified that she sued Engler because he was the one that terminated her and because he "just decided to listen to Koscinski and not hear [Plaintiff's] side of the story." (*Id.*, at p. 215.)

133. Plaintiff testified that she sued Ward because Ward was the one who went to Steigerwalt and told her about the "fabrications" in her sketchbook. (*Id.*, at pp. 201-202.)

**DISCUSSION**

In Count One, the only federal count of her Complaint, brought against all defendants, Plaintiff first claims her position was eliminated in retaliation for engaging in protected free speech under the First Amendment.

"To establish a First Amendment retaliation claim, a public employee must show that [her] speech is protected by the First Amendment and that the speech was a substantial or motivating factor in what is alleged to be the employer's retaliatory action." *Flora v. County of Luzerne*, 776 F.3d 169, 174 (3d Cir. 2015).

A public employee's statement is protected by the First Amendment when: "(1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have an 'adequate justification for treating the employee differently from any other member of the general public' as a result of the statement he made." *Hill v. Borough of Kutztown*, 455 F.3d 225, 241-42 (3d Cir. 2006), (quoting *Garcetti v.Ceballos*, 547 U.S. 410, 418 (2006)).

In evaluating whether a public employee's statement was made as a citizen, the key question is "whether the speech at issue is ordinarily within the scope of an employee's duties." *Lane v. Franks*, 134 S.Ct. 2369, 2379 (2014).

Here, the record reveals that Plaintiff made a single complaint regarding Koscinski to their supervisor, Principal Steigerwalt, stating that Koscinski had not fulfilled her scheduled work duties on one or two occasions. As such, the complaint was

not a matter of public concern, but was merely an internal matter spoken by Plaintiff as a teacher up the chain of command to her supervisor, the school principal.

Moreover, there is no evidence from which a reasonable jury could find that Engler even knew about any complaint made by Plaintiff concerning Koscinski and the IEPs prior to his decision to terminate her. To the contrary, Engler testified that he was unaware of Plaintiff's complaint against Koscinski until afte he conducted his investigation  and terminated the Plaintiff.  The record is uncontradicted that Plaintiff's complaint against Koscinski and/or regarding IEPs had nothing to do with her termination. SUF, at ¶¶ 74-91.

In Count One, Plaintiff also asserts a claim against defendant Engler for a deprivation of Plaintiff's liberty and property interests under the Fifth and Fourteenth Amendments. Complaint, at ¶¶ 42-46. She does not specify whether her claim is one for violation of substantive or procedural due process. *Id.* To the extent Plaintiff is asserting a substantive due process claim under the Fifth and Fourteenth Amendments based on an alleged employment interest as a public school teacher, the claim must fail.

 Plaintiff's interest in her employment as a kindergarten teacher for the Palmerton School District is simply not a fundamental property interest entitled to substantive due process. *Nicholas v. Pennsylvania State University*, 227 F. 3d 133, 140 (3d Cir. 2000); *Montanye v. Wissahickon School District*, 2003 WL 22096122 at *11 (E.D. Pa. August 11, 2003.

Additionally, Plaintiff appears to be asserting in Count One a substantive due process violation with respect to her liberty interest in her reputation. Complaint, at ¶ 42. She claims that the charges against her impaired her reputation for honesty and

morality and that she is entitled to a name-clearing hearing. *Id.*, at ¶¶ 42-43. To make

out a due process claim for deprivation of a liberty interest in reputation, "a plaintiff must

show a stigma to [her] reputation plus deprivation of some right or interest." *Hill v.*

*Borough of Kutztown*, 455 F. 3d 225, 236 (3d Cir. 2006)(citing *Paul v. Davis*, 424 U.S.

693, 701 (1976)). In the public employment context, the "stigma-plus" test has been

applied to mean that when an employee creates and disseminates a false and

defamatory impression about the employee in connection with her termination, it

deprives the employee of a protected liberty interest. *Hill*, 455 F. 3d at 236. The creation

and dissemination of a false and defamatory impression is the "stigma", and the

termination is the "plus." Id. However, the reputation-plus liberty interest "is not

accorded substantive due process protection; rather, the right accorded is that of

procedural due process or more specifically the right to an opportunity to refute the

charges and clear one's name." *Pulchaski v. Sch. Dist. of Springfield*, 161 F.Supp.2d

395, 406 (E.D.Pa. 2001). Therefore, there is no supportable claim of a substantive due

process violation for damage to reputation.

  To the extent Plaintiff raises a procedural due process claim under the stigma-

plus liberty theory, that claim also fails. As stated above, Plaintiff argues that she is

entitled to a name- clearing hearing because Engler's charges against her "(1) impaired

plaintiff's reputation for honesty and morality and resulted in a state investigation that

may strip her of her teaching certificate, (2) are hotly contested, and (3) were made in

connection with her employment." Complaint, at ¶¶ 42-43. The record reveals that she

has received all of the process that she is due. To establish entitlement to a "name-

clearing hearing," the aggrieved employee must show: (1) the public employer's

reasons for the discharge stigmatized the employee by seriously damaging his or her standing and association in the community or by foreclosing employment opportunities that may otherwise have been available; (2) the public employer made the reason or reasons public; and, (3) the employee denied the charges that led to the employee's firing. *Venezia v. William Penn Sch. Dist.*, 2006 U.S.Dist.LEXIS 90764, at *17 (E.D.Pa. Dec. 15, 2006)(citing *Gibson v. Caruthersville Sch. Dist. No. 8*, 336 F.3d 768, 773 (8th Cir. 2003)). Stigma involves "dishonesty, immorality, criminality, racism, or the like." *Id.* (citing *Waddell v. Forney*, 108 F.3d 889, 895 (8th Cir. 1997)). But when a discharged employee had an opportunity to explain the allegations in a meeting with her supervisor and with the governing board, she received "more than [was] constitutionally required." *Id.*, at *17-18 (citing *Coleman v. Reed*, 147 F.3d 751, 755 (8th Cir. 1998)).

The record demonstrates that Plaintiff had notice of the charges against her, SUF, at ¶¶ 125-127, had a meeting with Engler on a couple of occasions regarding the allegations against her, SUF, at ¶¶ 64-70, 72, 99, 121-123, and that she would be provided with a termination hearing before the PASD School Board. SUF, at ¶¶ 125-128. There was even a Department of Education investigation into the allegations, which confirmed them. SUF, at ¶¶ 132-136. The record shows Plaintiff received all process due to her. Additionally, the School Code provides that a school board may remove any employee "for incompetency, intemperance, neglect of duty, violation of any of the school laws of this Commonwealth, or other improper conduct." 24 P.S. § 5-514. The school board is only required to provide "due notice, giving the reasons therefor, and . . . [a] hearing if demanded." *Id.* The foregoing citations to the record demonstrate that the School Code's standard was met. Plaintiff was given notice of the charges

against her and a hearing before the School Board. There is no evidence in the record that indicates that Plaintiff was unaware of what she had been accused of doing, or was denied any hearing, or that she ever even demanded a hearing relating to the charges against her. Plaintiff is not now entitled to a name-clearing hearing.

Finally, Plaintiff also contends in Count One that she was denied due process because the book of drawings did not constitute "just cause" to terminate her, and that Engler relied on fabricated descriptions of the drawings in the book to establish just cause. Complaint, at ¶¶ 44-46. There is no sufficient evidence in the record from which a reasonable jury could conclude that Engler relied on fabricated descriptions of the drawings in the book to justify his decision to terminate Plaintiff. On the contrary, the undisputed record reveals that Engler conducted a thorough and unbiased investigation which revealed that Plaintiff had portrayed the very kindergarten students in her class with whom she had been entrusted to protect and nurture in a humiliating and degrading manner SUF, at ¶¶ 125-126. Engler did not just rely on Koscinski's account of the drawings in the book, but substantiated Koscinski's account by interviewing Long and Heimrich. (SUF, at ¶¶ 104-110.) Indeed, Plaintiff herself admitted to having portrayed many of the students in the manner contended by Koscinski, Heimrich, Long and Ward. (SUF, at ¶¶ 70, 71, 86, 126.) The Department of Education concurred with the results of Engler's investigation, finding that Plaintiff created and shared an "unprofessional and offensive booklet" and that plaintiff's termination amounted to sufficient discipline. SUF, at ¶¶ 134-136.

Accordingly, the Court will enter judgment in favor of defendant Engler and against the Plaintiff on Count One of the Complaint. As a result only four pendant state law claims remain.

Pursuant to Pennsylvania's Political Subdivision Torts Claim Act (hereinafter "PSTCA"), local governments and its officials are generally immune from civil liability for state law tort claims. See 42 Pa. C.S.A. §§8541, 8545.3 Section 8550 of the PSTCA provides an exception to this general rule of immunity when a governmental employee causes an injury and that "act constituted a crime, actual fraud, actual malice or willful misconduct . . . ." 42 Pa. C.S.A. §8550. Under this provision, the immunity of the governmental employee that caused the injury is eliminated.

The record does not contain any evidence of actual malice or willful misconduct on the part of any of the three defendants. Plaintiff has nobody but herself to blame for her predicament. Accordingly the defendants are immune under the PSTCA from civil liability on Plaintiff's state law tort claims for tortious interference with contractual relations, tortious interference with prospective contractual relations, defamation and civil conspiracy.

An appropriate Order follows.